UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- X
                                           :
GARTH DRABINSKY,                     :
                        Plaintiff,   :
                                             :            22 Civ. 8933 (LGS)
             -against-               :
                                             :       **OPINION AND ORDER**
ACTORS' EQUITY ASSOCIATION,     :
                             Defendant.  :
------------------------------------------------------------- X

LORNA G. SCHOFIELD, District Judge:

Plaintiff Garth Drabinsky brings this action against Defendant Actors' Equity Association ("AEA") alleging defamation, intentional tort, negligence and violations of Sections 1 and 2 of the Sherman Antitrust Act. AEA moves to dismiss the First Amended Complaint (the "FAC") in its entirety. For the reasons stated below, the motion is granted.

I.   **BACKGROUND**

The following facts are taken from the FAC and assumed to be true for purposes of this motion. *See Francis v. Kings Park Manor, Inc.*, 992 F.3d 67, 72 (2d Cir. 2021).

Drabinsky is an award-winning producer of live theater, who has made many and varied contributions to his field over several decades. In particular, Drabinsky has endeavored to use his work to confront and combat racial injustice, in the theater world and in society broadly. Several of Drabinsky's productions have involved the use of racial slurs, including the "n-word." The choices to include those slurs have been controversial, though Drabinsky and others argue that using such language is an important part of confronting historical racism. In 2009, Drabinsky was convicted of accounting fraud in Canada and sentenced to a term of incarceration that ended in 2013. Related charges brought in this District ultimately were dismissed.

AEA is a labor union that represents more than 50,000 professional theater actors and stage managers.  AEA has contracts with many theaters throughout the United States, and it enters into contracts with producers.  AEA does not permit its members to work in productions that do not contract with the union, nor does it permit the producers with whom it contracts to hire non-AEA actors or stage managers.  AEA has "a special bond" with other unions representing professionals in related fields, including American Guild of Musical Artists, American Guild of Variety Artists, Guild of Italian American Actors and Screen Actors Guild - American Federation of Television and Radio Artists.  Collectively, AEA and the related unions are known as the Associated Actors and Artists of America ("4A").  AEA also maintains a "Do Not Work List," which Drabinsky refers to as a "Blacklist."  The Do Not Work List includes producers and productions with which AEA members are prohibited from working.  In AEA's words, the "Do Not Work List is an additional tool to alert members of [AEA] or our 4A's sister unions as to the non-union status of certain employers."

Beginning in 2013, Drabinsky produced *Paradise Square*.  As Drabinsky puts it, the musical "brings to the forefront the racial conflict in the Five Points neighborhood of New York City in the 1860's."  After *Paradise Square*'s initial run in Berkeley, California, in late 2018 and early 2019, the live theater industry shut down due to the COVID-19 pandemic in March 2020.  In 2021, Drabinsky negotiated deals to stage further runs of *Paradise Square* in Chicago and on Broadway, once live theatergoing was possible again.

The Chicago production of *Paradise Square* was troubled in several ways, including with labor disputes and work stoppages.  Drabinsky believed that the cast was struggling with the issues of racism and prejudice raised by the musical.  At a meeting on October 2, 2021, Drabinsky related to the cast his experience producing a prior show called *Show Boat*.  A song in

that musical, originally written in 1927, contained the "n-word."  After much reflection, Drabinsky had decided not to change that element of the show, and he had been harassed for that decision.  Drabinsky hoped to inspire the cast to wrestle with the difficult material in *Paradise Square*.  Weeks later, AEA sent the General Manager ("GM") of *Paradise Square* a letter accusing Drabinsky of creating a hostile work environment by using racial slurs during rehearsal.

Other issues with the Chicago production included a dispute over housing costs and allegations of sexual misconduct against a cast member.  In each case, Drabinsky attempted to resolve the issues to protect and benefit the cast, and AEA did not assist.  AEA also accused Drabinsky of violating his agreement to abide by AEA's collective bargaining agreement, by failing to keep some actors from the Berkeley production on in Chicago.  After the Chicago production closed, AEA delayed in refunding the production's bond, which was posted as security against default on the production's obligations under the AEA Collective Bargaining Agreement with the Broadway League ("CBA").

When *Paradise Square* transferred to Broadway, the musical's troubles continued.  The production was delayed and hindered by a resurgence of COVID-19.  AEA asserted a grievance against Drabinsky for failing to provide cast members with proper contracts and then instructed its members not to show up for a day of work.  When the cast was docked pay for the day of missed work, AEA filed another grievance.  The work stoppage and ensuing dispute resulted in negative press coverage of the production and of Drabinsky.  Drabinsky called another meeting with the Cast to attempt to bring them together, but several members did not embrace Drabinsky's message and responded to him disrespectfully.  AEA again was present at the meeting and did not intervene.

After *Paradise Square* finally opened, it almost immediately had to shut down for ten days due to a COVID outbreak among the cast.  The outbreak may have been caused by an opening night party and certain cast members' failure to comply with vaccination requirements. Nonetheless, the musical ultimately resumed and was nominated for and won several awards. During the musical's run, Drabinsky navigated several other conflicts with cast members, including (1) a staffing issue with the professionals responsible for cast members' wigs, (2) an attempt by one professional to quit the production without notice due to a claimed hostile work environment, (3) an attempt by two choreographers to extort payment to which they claimed an entitlement and (4) ongoing difficulties with a stage manager who clashed with Drabinsky and gave critical statements to the press, which Drabinsky claims are false.  Drabinsky attributes much of the cast and crew's dissatisfaction to AEA's false statements and grievances creating an environment of negativity around the production.

After *Paradise Square* closed, the cast sent a letter to AEA, asserting that Drabinsky controlled the production, withheld benefits and payment and created an unsafe and hostile work environment.  AEA then placed Drabinsky on its Do Not Work List.  Throughout its Chicago and Broadway runs, the production entities responsible for *Paradise Square* had been signatories to the relevant CBA with AEA.

## II.    STANDARD

On a motion to dismiss, a court accepts as true all well-pleaded factual allegations and draws all reasonable inferences in favor of the non-moving party but does not consider "conclusory allegations or legal conclusions couched as factual allegations."  *Dixon v. von Blanckensee*, 994 F.3d 95, 101 (2d Cir. 2021) (internal quotation marks omitted).  To withstand a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a

claim to relief that is plausible on its face." *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 854 (2d Cir. 2021) (internal quotation marks omitted) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678; *accord Dane v. UnitedHealthcare Ins. Co.*, 974 F.3d 183, 189 (2d Cir. 2020).  It is not enough for a complaint to allege facts that are consistent with liability; it must "nudge[]" claims "across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *accord Bensch v. Est. of Umar*, 2 F.4th 70, 80 (2d Cir. 2021).  To survive dismissal, "plaintiffs must provide the grounds upon which [their] claim rests through factual allegations sufficient to raise a right to relief above the speculative level." *Rich v. Fox News Network, LLC*, 939 F.3d 112, 121 (2d Cir. 2019) (alteration in original) (internal quotation marks omitted).

## III.    DISCUSSION

### A.    New York State Law Tort Claims

New York law applies to the tort claims in the FAC because the parties assume it does. *See In re Snyder*, 939 F.3d 92, 100 n.2 (2d Cir. 2019) ("[I]mplied consent is . . . sufficient to establish the applicable choice of law . . . ." (internal quotation marks omitted)).

Each of the FAC's tort claims -- for defamation, intentional tort and negligence -- is barred by New York's *Martin v. Curran* doctrine.  In *Martin v. Curran*, 101 N.E.2d 683, 686 (N.Y. 1951), the Court of Appeals held that lawsuits could be maintained against unincorporated associations only if "the individual liability of every single member can be alleged and proven," meaning each member must have "expressly or impliedly with full knowledge authorize[d] or ratif[ied] the specific acts in question." *Id.* at 686.  The tort claims are dismissed because the FAC does not sufficiently allege authorization and ratification by each of AEA's 50,000 plus

members.  *See, e.g.*, *Moleon v. Alston*, No. 21 Civ. 1398, 2021 WL 5772439, at *11 (S.D.N.Y.

Dec. 3, 2021) (dismissing claims on this basis and collecting federal cases doing the same);

*Performing Arts Ctr. of Suffolk Cnty. v. Actor's Equity Ass'n*, No. 20 Civ. 2531, 2022 WL

16755284, at *5 (E.D.N.Y. Aug. 25, 2022) (same and collecting New York state cases), *R. & R.*

*adopted*, 2022 WL 4977112 (E.D.N.Y. Sept. 30, 2022).

The holding in *Martin* has long been criticized because it "imposes an onerous and

almost insurmountable burden on individuals seeking to impose liability on labor unions."

*Modeste v. Local 1199, Drug, Hosp. & Health Care Emps. Union, RWDSU, AFL-CIO*, 850 F.

Supp. 1156, 1168 (S.D.N.Y. 1994), *aff'd*, 38 F.3d 626 (2d Cir. 1994).  For that reason, the

Second Circuit has held that *Martin* does not apply to, for example, actions under 42 U.S.C. §

1983, because such broad immunity conflicted with the policies underlying federal civil rights

law.  *Jund v. Town of Hempstead*, 941 F.2d 1271, 1281 (2d Cir. 1991); *accord Solow v. Delit*,

No. 90 Civ. 2273, 1992 WL 249954, at *3 (S.D.N.Y. Sept. 21, 1992).  However, the New York

Court of Appeals reaffirmed *Martin* as applied to New York state law claims, even while

"question[ing] the continued utility or wisdom of the *Martin* rule."  *Palladino v. CNY Centro,*

*Inc.*, 12 N.E.3d 436, 438-42 (N.Y. 2014); *see K.D. Hercules, Inc. v. Laborers Local 78 of*

*Laborer's Int'l Union of N. Am.*, No. 20 Civ. 4829, 2022 WL 204216, at *5 (S.D.N.Y. Jan. 24,

2022) (recognizing that *Jund* applies only to federal claims and that, after *Palladino*, *Martin* still

applies to New York state law claims in federal court).  Drabinsky's arguments that *Martin* either

has already been abrogated or should be, for public policy reasons, therefore are unpersuasive.

Contrary to Drabinsky's arguments, the FAC does not sufficiently allege authorization or

ratification by alleging the "silent acquiescence" of AEA's members without alleging that they

had full knowledge of AEA's actions.  In the case on which Drabinsky relies, the plaintiff

alleged, in non-conclusory terms, that every member of the defendant union had attended certain meetings and been briefed about the union's actions against the plaintiff at those meetings. *Metro. Opera Ass'n, Inc. v. Local 100, Hotel Emps. & Rest. Emps. Int'l Union*, No. 00 Civ. 3613, 2004 WL 1943099, at *16-17 (S.D.N.Y. Aug. 27, 2004).  That is distinguishable from Drabinsky's claim that the members of AEA ratified the actions at issue here simply because the Do Not Work List on which Drabinsky appears is available on AEA's website.  Even if the FAC contained a conclusory allegation that each of AEA's tens of thousands of members had full knowledge of AEA's actions that allegedly harmed Drabinsky, the FAC contains no factual allegations to render that conclusion plausible.

Drabinsky's request for leave to amend his pleadings to add such allegations is denied. Drabinsky filed the FAC after AEA had filed a pre-motion letter asserting that *Martin v. Curran* barred the state law claims in the original Complaint.  After AEA filed a second pre-motion letter asserting that *Martin* still barred the state law claims in the FAC, Drabinsky did not seek leave to amend and elected to stand on the allegations of the FAC.  Pursuant to the Court's Individual Rule III.C.2, Drabinsky was on notice that his pre-motion letter was to "unambiguously state any intention to seek leave to amend" and that his "response will be taken into account in deciding whether further leave to amend will be granted in the event the motion to dismiss is granted." Drabinsky's proposed amendment also would be futile.  The deficiency in the FAC is not so "petty" as failing to recite "each and every" before each reference to AEA's members.  *Cf. Metro. Opera*, 2004 WL 1943099, at *18.  Rather, none of the facts alleged or alluded to in the FAC plausibly support a claim that every one of AEA's more than 50,000 members had knowledge of AEA's actions against Drabinsky.

Drabinsky's argument that *Martin* does not apply because AEA's actions occurred outside the context of a labor dispute is irrelevant. *Martin* applies to unincorporated voluntary associations generally, not only labor unions, and not only in particular kinds of disputes. *See, e.g.*, *Bidnick v. Grand Lodge of Free & Accepted Masons of State of N.Y.*, 72 N.Y.S.3d 547, 550 (2d Dep't 2018) (applying the *Martin* rule to dismiss claims against a non-union voluntary association in a non-labor dispute).

Because the FAC's tort claims are barred by *Martin v. Curran*, it is unnecessary to consider whether those claims also are preempted by federal labor law.

### B.    Federal Antitrust Claims

The FAC's antitrust claims are barred by the statutory exemption from the federal antitrust laws enjoyed by labor unions. "[L]abor unions acting in their self-interest and not in combination with nonlabor groups enjoy a statutory exemption from Sherman Act liability." *H.A. Artists & Assocs., Inc. v. Actors' Equity Ass'n*, 451 U.S. 704, 714 (1981) (citing *United States v. Hutcheson*, 312 U.S. 219, 232 (1941)).

Drabinsky's claims under both Sections 1 and 2 of the Sherman Act are based on the alleged group boycott, by members of AEA and the other 4A unions, of productions in which Drabinsky is involved and the resulting exclusion of Drabinsky from the market that AEA allegedly monopolizes. That boycott was allegedly in response to a letter from the *Paradise Square* cast to AEA. Cast members complained to their union about a hostile and unsafe work environment and unpaid wages and benefits, and asserted that Drabinsky controlled relevant aspects of the production. Based on the allegations in the FAC, AEA acted in its self-interest by barring its members from working for a producer who had defaulted on his obligations to the union, and AEA did so without combining with non-labor entities. *See Home Box Off., Inc. v.*

*Dirs. Guild of Am., Inc.*, 531 F. Supp. 578, 583-84, 583 n.3 (S.D.N.Y. 1982) (applying statutory exemption to a letter from a union to its members stating that they were forbidden from working for a company that had not signed collective bargaining agreements). AEA's actions therefore are exempt from scrutiny under the antitrust laws.

In general, a union acts in its "self-interest" when it acts "to cope with job competition and to protect wage scales and working conditions." *H.A. Artists*, 451 U.S. at 718 n.23; *see Allied Int'l, Inc. v. Int'l Longshoremen's Ass'n, AFL-CIO*, 640 F.2d 1368, 1380 (1st Cir. 1981) (stating that "activities are in the self-interest of a labor organization 'if they bear a reasonable relationship to a legitimate union interest,'" and "protect[ing] the wages, hours of employment, or other working conditions of its member-employees . . . are at the heart of national labor policy"), *aff'd*, 456 U.S. 212 (1982). On the face of the Complaint, AEA "serve[d] the interests of its members" when it responded to the grievances of some of its members -- about wages, benefits and working conditions -- by barring other actors and artists from working with Drabinsky. *Intercontinental Container Transp. Corp. v. N.Y. Shipping Ass'n*, 426 F.2d 884, 887 n.2 (2d Cir. 1970). Acting to uphold standards for wages, benefits and working conditions is among the "'legitimate objects' of organized labor." *Republic Prods., Inc. v. Am. Fed'n of Musicians of U.S. & Can.*, 245 F. Supp. 475, 481 (S.D.N.Y. 1965) (quoting 15 U.S.C. § 17). Barring members from working for those who do not uphold those standards is a "traditional union activity" to achieve "traditional union ends." *USS-POSCO Indus. v. Contra Costa Cnty. Bldg. & Constr. Trades Council, AFL-CIO*, 31 F.3d 800, 809 (9th Cir. 1994); *see, e.g.*, *Hunt v. Crombroch*, 325 U.S. 821, 823-24 (1945) (applying exemption to employer boycott); *Home Box Office*, 531 F. Supp. at 583-84 & n.3 (applying statutory exemption to, effectively, a Do Not Work List).

Contrary to Drabinsky's argument, the fact that the boycott extends to hypothetical future productions in which Drabinsky is involved, which might otherwise comply with AEA's CBA, does not place AEA's actions outside the statutory exemption.  In essence, Drabinsky argues that his punishment does not fit his purported misconduct, or sweeps too broadly and impacts other productions that have done nothing wrong besides hiring him.  That argument is unsuccessful because the force of the statutory exemption is such that, if a union acts in its self-interest and that of its members, "it is no proper concern of the courts whether the action is that best adapted to suit its purpose."  *Intercontinental Container*, 426 F.2d at 887 n.2 ("So long as a union acts in its self-interest and does not combine with non-labor groups, the licit and the illicit are not to be distinguished by any judgment regarding the wisdom or unwisdom, the rightness, the selfishness or unselfishness of the end of which the particular union activities are the means." (quoting *Hutcheson*, 312 U.S. at 232) (cleaned up)).

Drabinsky argues that AEA's punitive actions lack a requisite connection to an active "labor dispute."  Even assuming that some link to a bona fide labor dispute is required, the exemption is not as limited as Drabinsky suggests.  The Supreme Court has held that union members collectively choosing not to sell their labor to a particular employer -- boycotting that employer -- does not violate the antitrust laws, even where their "refusal to accept employment was due to personal antagonism" arising from a *prior* labor dispute.  *Hunt*, 325 U.S. at 823-24; *accord Republic Prods.*, 245 F. Supp. at 482 (citing *Hunt* for the rule that it is irrelevant "how outrageous the union's conduct was from a moral point of view," even where a union acted "purely out of personal spite and vindictiveness"); *Perry v. Int'l Transp. Workers' Fed'n*, 750 F. Supp. 1189, 1197 (S.D.N.Y. 1990) (citing *Hunt* for the proposition that "[e]ven if a union's actions are intended to put a company out of business the union's actions may be exempt from

antitrust liability.").  In responding to a labor dispute, unions can take actions that are intended to advance their goals beyond that specific dispute without violating the antitrust laws.  *See USS-POSCO*, 31 F.3d at 809 ("That these activities were not undertaken to unionize this particular employer but in order to eliminate non-union shops altogether by making an example of [plaintiff] does not matter.").

If unions' ability to impose costs on an employer were so limited in time and scope, no matter how serious the breach of workers' rights, the antitrust laws would seriously hamstring unions' ability to enforce the rights for which they collectively bargain.  Congress evidently intended otherwise when it granted unions the statutory exemption.  *See* 15 U.S.C. § 17 ("The labor of a human being is not a commodity or article of commerce.  Nothing contained in the antitrust laws shall be construed to forbid the existence and operation of labor . . . organizations . . . or to forbid or restrain individual members of such organizations from lawfully carrying out the legitimate objects thereof; nor shall such organizations, or the members thereof, be held or construed to be illegal combinations or conspiracies in restraint of trade, under the antitrust laws.").

It is not for Drabinsky or a court to say that AEA's actions are not in its self-interest because, in its efforts to impose consequences on Drabinsky for violating workers' rights, AEA might boycott a production that would have complied with the CBA.  Such tradeoffs concern "the wisdom or unwisdom" of AEA's actions and are outside the purview of the antitrust law. *Intercontinental Container*, 426 F.2d at 887 n.2.  The only binding case Drabinsky cites in which a court circumscribed the scope of unions' "legitimate self-interest" is distinguishable.  In *H.A. Artists*, 451 U.S. at 722, the Supreme Court addressed an earlier AEA program that (1) regulated artists' agents and (2) collected fees from those agents.  *Id*. at 722.  The former was held to fall

within the statutory exemption, but not the latter.  *Id.*  The Supreme Court held that the union could not necessarily subsidize itself by extracting fees from other market participants without any antitrust scrutiny.  *Id.*  While it is theoretically always in a union's interest to raise money by any legal means, the Court in *H.A. Artists* found collecting fees from agents too tangentially connected to the union's traditional goals of labor organizing to warrant complete antitrust immunity.  *Id.* ("If Equity did not impose these franchise fees upon the agents, there is no reason to believe that any of its legitimate interests would be affected.").  In contrast, AEA's actions here are directly linked to the union's core goals of maintaining wages and working conditions. In *Paradise Square*, AEA's members were supposed to be protected by the CBA, but Drabinsky purportedly withheld their pay and created a hostile work environment anyway.  AEA reasonably could conclude that, even if a future production signed on to the CBA, its members would be at risk if Drabinsky were involved.

Drabinsky also argues that AEA's actions are not exempt from the antitrust laws because the other 4A unions joined AEA's "boycott."  Drabinsky asserts that the other 4As' involvement shows that AEA's actions exceeded the bounds of a "labor dispute," thereby forfeiting antitrust immunity.  This argument is unavailing because the FAC specifically alleges that the members of AEA and the 4As "are in direct horizontal competition with one another for roles as actors and positions as stage managers in the entertainment industry."  The other unions are thus not only "labor groups"-- defeating any argument that AEA acts in combination with a "nonlabor group" -- they are "parties to a labor dispute" between AEA and Drabinsky.  *H.A. Artists*, 451 U.S. at 717 (internal quotation marks omitted).  The coordinated "boycott" by AEA and the other 4A unions seeks to "arrange terms or conditions of employment," for the unions' members by discouraging involvement in productions of which Drabinsky is a part.  *H.A. Artists*, 451 U.S. at 721 (quoting

29 U.S.C. § 113(c)); *Hutcheson*, 312 U.S. at 234 ("[U]nder § 13(b) [of the Norris-Laguardia Act, 29 U.S.C. § 113(b)] a person is 'participating or interested in a labor dispute' if he 'is engaged in the same industry, trade, craft, or occupation in which such dispute occurs, or has a direct or indirect interest therein, or is a member, officer, or agent of any association composed in whole or in part of employers or employees engaged in such industry, trade, craft, or occupation'."). AEA's dispute with Drabinsky is a "labor dispute" even if, as Drabinsky claims, as a "creative producer" he did not exercise certain prerogatives of an "employer."  29 U.S.C. § 113(c) ("The term 'labor dispute' includes any controversy concerning terms or conditions of employment . . . regardless of whether or not the disputants stand in the proximate relation of employer and employee."); *see Confederación Hípica de Puerto Rico v. Confederación de Jinetes Puertorriqueños, Inc.*, 30 F.4th 306, 314 (1st Cir. 2022).  AEA's coordination with the other 4A unions therefore does not preclude antitrust immunity on the grounds that AEA either combines with nonlabor groups or with entities not party to a labor dispute.

Lastly, Drabinsky suggests that AEA *might* have combined with non-labor entities, "[t]o the extent that . . . producers were involved in the decision to blacklist Drabinsky."  The FAC alleges, "[u]pon information and belief, some members of [the 4As] also work as producers . . . in direct competition with Drabinsky."  The FAC also alleges that, to the extent those producers exist, they "are also actors or at least members of unions representing actors."  On the basis of those allegations, any members of the 4As who might also work as producers still constitute a "labor group" for purposes of the statutory exemption, because they compete with the 4A members who are only actors or stage managers.  *See Am. Fed'n of Musicians of U.S. & Can. v. Carroll*, 391 U.S. 99, 109-10 (1968) (applying statutory exemption to actions by the musicians union that encompass "musicians on the occasions they are [band] leaders and play a role as

13

employers"); *accord Horror Inc. v. Miller*, 335 F. Supp. 3d 273, 299 (D. Conn. 2018) (noting

that the test announced in *Carroll* asks whether "there is 'job or wage competition or some other

economic inter-relationship affecting legitimate union interests between the union members'"

and the purported non-labor group).  Thus, even assuming the truth of the FAC's conclusory

allegations and Drabinsky's speculation about the role of producers in AEA's actions, the

statutory exemption still applies.

> Because the statutory exemption applies, it is unnecessary to decide whether the non-

statutory antitrust exemption also applies and whether FAC sufficiently alleges antitrust injury.

## IV.    CONCLUSION

> For the foregoing reasons, AEA's motion to dismiss is GRANTED, and the FAC is

dismissed with prejudice.

> The Clerk of Court is respectfully directed to close the motion at Docket Number 38 and

close the case.

Dated: April 14, 2023
      New York, New York

**LORNA G. SCHOFIELD**
**UNITED STATES DISTRICT JUDGE**

14